# In the United States Court of Federal Claims

No. 07-395 C

(Filed: August 28, 2008)

| | | |
|---|---|---|
| **INSURANCE COMPANY OF THE WEST**, Plaintiff, | * | Failure to state a claim; Miller Act bonds; doctrine of equitable subrogation; surety's notice of contractor default; Government's duty to act with reasoned discretion to protect surety's interests in contract funds |
| v. | * | |
| **THE UNITED STATES**, Defendant. | * | |

*Gregory M. Weinstein*, of Langley Weinstein Hamel, LLP, Dallas, TX, for Plaintiff.

*Donald E. Kinner*, Assistant Director, and *Ellen M. Lynch*, Trial Attorney, with whom were *Jeanne E. Davidson*, Director, and *Peter D. Keisler*, Assistant Attorney General, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant.

## OPINION

**DAMICH**, Chief Judge.

Before the Court is a motion by Defendant, the United States ("the Government"), to dismiss this case pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC") for failure to state a claim upon which relief can be granted. Plaintiff, Insurance Company of the West ("ICW"), filed this action to recover for a series of progress payments that it believes the Government wrongfully disbursed to Texas Mechanical Systems ("TMS"), a government contractor to which ICW issued surety bonds. The Government asserts that ICW is not entitled to recover for the disbursed progress payments because the Government's equitable duty to act with reasoned discretion to protect ICW's interests was never

triggered, as ICW did not provide sufficient notice to the contracting officer of a default by TMS on the particular bonded contracts at issue.[1] In particular, the Government argues that ICW only notified the contracting officer of an actual default on a different bonded contract, not the bonded contracts at issue in this case. The Government also, in its initial brief, argued that notice of potential default could not trigger the Government's equitable duty. In supplemental briefing, however, the Government seemed to concede that it would.

Assuming all allegations in the complaint to be true, and taking all reasonable factual inferences in favor of ICW, the Court finds that ICW has sufficiently presented a claim upon which relief can be granted. A letter sent to the Government's contracting officer from ICW prior to disbursement of the progress payments appears to have met the threshold for providing adequate notice of a potential default by TMS on the bonded contracts at issue, thereby triggering the Government's duty to act with reasoned discretion to protect ICW's interests in the contract funds. As such, the Government's motion to dismiss this case pursuant to Rule 12(b)(6) is DENIED.

## I. Background

On September 28, 2005, TMS was awarded two contracts, No. SBA0610-05-508537/V519C-018 2 ("the #182 contract") and No. SBA0610-05-507056/V519C-018 3 ("the #183 contract"), to improve a Veterans Administration ("VA") building in Big Springs, Texas. Compl. at 1. On October 14, 2005, ICW issued a performance bond and a payment bond for each of these contracts in favor of the VA.[2] *Id.* at 2. On the same day, the VA issued a notice to proceed. Pl.'s Supp. Br. at Ex. 1.

On March 23, 2006, the contracting officer for the VA, Ms. Beverly Atwell, sent a letter to TMS stating that "[a]s of today, approximately 20% of work activity has been completed although 65% of the construction period has expired." *Id.* Ms. Atwell requested that TMS "immediately" provide an updated progress schedule "showing the steps [TMS would] take to expedite work activity as necessary to allow the contract to be completed on schedule." *Id.* The record does not reflect whether TMS did provide an updated progress schedule or whether the VA communicated any further concerns to TMS.

---

[1] The Government also originally argued that ICW, as a non-takeover surety paying out only under its payment bond, could not maintain an action against the Government because it was neither in privity with the Government nor equitably subrogated to the rights of a contractor who did have privity. Def. Mot. at 1. However, in light of the Federal Circuit's decision in *National American Insurance Co. v. United States*, 498 F.3d 1391 (Fed. Cir. 2007), which was issued during briefing on the Government's present motion, the Government has withdrawn this argument. Def.'s Reply Br. at 1.

[2] A performance bond guarantees performance of the contract and a payment bond guarantees payment to all persons supplying labor and material for the project.

On June 28, 2006, Ms. Melissa Aros, a "Surety Claim Analyst" for ICW, sent a letter to Ms. Atwell, asserting "ICW's rights of equitable subrogation" and citing *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132 (1962). Compl. at Ex. B. Ms. Aros's letter referenced the contracts at issue in this litigation and stated that the letter "serves as ICW's formal request that no further funds be disbursed to TMS without the express written consent of ICW," including "all present and future progress payment billings."[3] *Id.* But, Ms. Aros did not expressly point to a problem with the contracts referenced. Instead, the letter stated that "ICW has been made aware of claims and unpaid bills pertaining to vendors and subcontractors *on another bonded project* involving TMS," leading ICW to believe that it may already be liable under other bonds due to TMS's unpaid bills. *Id.* (emphasis added). Because of this situation, Ms. Aros informed Ms. Atwell that "any contract funds on these contracts which you are presently holding, and other contracts involving TMS, are considered trust funds for the specific payment of outstanding labor or material suppliers and subcontractors." *Id*

The VA subsequently disbursed four payments to TMS, totaling $114,877.38, without first consulting with ICW. Compl. at 2-3. On November 22, 2006, the VA sent a letter informing ICW that these payments had been made and that the VA "did default [TMS] on November 15, 2006." *Id.* at Ex. C. When TMS defaulted, ICW was obligated under the bonds to pay suppliers and subcontractors under the #182 and #183 contracts a total of $123,302.59. *Id.* at 3. Thus, ICW now seeks as damages the sum of the progress payments disbursed by the VA after Ms. Aros's letter was sent. *Id.* at 4.

---

[3] Ms. Aros's letter was captioned as follows:

| | | |
|---|---|---|
| Re: | Principle: | Texas Mechanical Systems, Inc. |
| | Bond No.: | 2166029-00 |
| | Project: | Covered Ambulance Entrance |
| | Obligee: | West Texas VA Health Care System |
| | Contract no.: | SBA0610-05-508537/V519C-0182 |
| | Bond No.: | 2166030-00 |
| | Project: | Correct Electrical Deficiencies |
| | Obligee: | West Texas VA Health Care System |
| | Contract no.: | SBA0610-05-507056/V519C-0183 |

Compl. at Ex. B. Ms. Aros began her letter by reminding Ms. Atwell that ICW is the surety for TMS in conjunction with "the referenced projects." *Id.*

## II. Analysis

### A. Legal Standard

To succeed on a motion to dismiss for failure to state a claim upon which relief can be granted, the movant must establish that the plaintiff failed to present sufficient allegations to entitle it to a remedy. *Godwin v. United States*, 338 F.3d 1374, 1377 (Fed. Cir. 2003). Conversely, in order to survive a motion to dismiss, a plaintiff must establish that the complaint "adequately states a claim," that is, that the complaint "contain[s] either direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory." *Bell Atlantic Corp. v. Twombly*, 550 U.S. ___, 127 S. Ct. 1955, 1969 n.8 (2007) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)). A well-pleaded complaint will survive a motion to dismiss even if it appears "that a recovery is very remote and unlikely." *Id* at 1965 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686 (1974)). In ruling on a motion to dismiss, the Court must assume the facts alleged in the complaint to be true and draw all reasonable inferences in Plaintiff's favor. *Id.* Allegations in the complaint need not be overly detailed, but do need to "raise a right to relief above the speculative level" or "nudge[] [the] claims across the line from conceivable to plausible." *Id*. at 1965, 1974. "[O]nce a claim has been stated adequately," however, "a plaintiff receives the benefit of imagination so long as the hypotheses are consistent with the complaint." *Id*. at 1969 (citation and internal quotation marks omitted).

### B. The Doctrine of Equitable Subrogation

In general, the doctrine of equitable subrogation provides that a surety can step into the shoes of a defaulting contractor and assert the contractor's rights in seeking reimbursement of its costs. *National Am. Ins. Co.*, 498 F.3d at 1305-07; *see also Pearlman*, 371 U.S. at 137 ("probably there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed"). Equitable subrogation rights arise when a surety who provides a payment and/or performance bond on a contract performs its obligations under the bond or bonds, following a contractor default. *Id.*; *United States Fid. & Guar. Co. v. United States*, 475 F.2d 1377, 1381-82 (Ct. Cl. 1973); *Commercial Cas. Ins. v. United States,* 71 Fed. Cl. 104, 105 (2006).

Under the Miller Act, 40 U.S.C. § 3131 *et seq*., when the cost for construction, repair or alteration of a government building or public work, pursuant to a federal government contract, exceeds $100,000, the contractor awarded the contract must furnish the Government with two surety bonds, one guaranteeing performance of the contract and one guaranteeing payment to all persons supplying labor and material for the project. 40 U.S.C. § 3131(b)(1)-(2); *see also Pearlman*, 371 U.S. at 133. Thus, if the contractor defaults on the contract, the surety that issued the bonds will be responsible for ensuring completion of the project and/or satisfying unpaid bills to suppliers or subcontractors.

In the context of government contracts, though Miller Act sureties usually lack privity with the Government, "the surety may be able to invoke the doctrine of equitable subrogation to step into the shoes of the contractor for the purpose of satisfying the jurisdictional requirements of the Tucker Act, 28 U.S.C. § 1491(a)," to sue the Government to recoup contract funds. *National Am. Ins. Co.*, 498 F.3d at 1304. When a surety claims its right to equitable subrogation and "steps into the shoes" of the prime contractor, the surety can seek to recover contract funds still held by the Government as retainage. *Pearlman*, 371 U.S. at 139 (confirming "the surety's right to subrogation in [a retained] fund whether its bond be for performance or payment"). Sureties can also seek to recover from the Government any contract funds which had been disbursed to the contractor after the surety notified the Government of the contractor's default. *National Am. Ins.*, 498 F.3d at 1305-06; *Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1163 (Fed. Cir. 1985) ("we hold that both the Claims Court and this court have jurisdiction to hear the claim of a Miller Act surety against the United States for funds allegedly improperly disbursed to a contractor"). Once the Government has been notified by the surety of the contractor's default, the Government assumes a "stakeholder" duty to act with reasoned discretion to protect the interests of the surety in the remaining contract funds. *Balboa*, 775 F.2d at 1162; *Fireman's Fund Mut. Ins. Co. v. United States*, 909 F.2d 495, 498 (Fed. Cir. 1990); *American Fid. Fire Ins. Co. v. United States*, 513 F.2d 1375, 1379 (Ct. Cl. 1975). It is the threshold requirements for determining whether a surety provided sufficient "notice of default" which are at issue here, namely, whether a notice of potential default can be sufficient to trigger the Government's equitable "stakeholder" duty and, if so, whether ICW provided a notice of potential default[4] which was sufficiently specific to the bonded contracts at issue in this case.

**1. Notice Requirement**

The law is clear that, in order to trigger the Government's duty to act with reasoned discretion to protect a surety's interests in contract funds, the surety must give the Government some form of notice of a default. *See, e.g., Fireman's Fund*, 909 F.2d at 498; *Balboa*, 775 F.2d at 1162; *United States Fire Ins. Co. v. United States*, 78 Fed. Cl. 308, 325-26 (2007); *Lumbermens Mut. Cas. Co. v. United States*, 67 Fed. Cl. 253, 255 (2005); *Westchester Fire Ins. Co. v. United States*, 52 Fed. Cl. 567, 576 (2002).

Previous decisions are not, however, explicit as to whether a surety's notice must refer to an actual default (i.e., one which has already transpired) or whether the notice can merely inform the Government that a default is probable or imminent. Some of the cases cited by the parties appear to require that the surety provide notice that the contractor "has defaulted" already, *e.g., Balboa*, 775 F.2d at 1162, other cases seem to waver on the distinction between an actual or potential default, *e.g., Fireman's Fund*, 909 F.2d at 498, while still others state that notice of a mere "danger" of default can be sufficient, *e.g., American Fidelity*, 513 F.2d at 1380.

[4] ICW does not contend that it provided notice to the contracting officer of an actual default, that is, one which had already transpired.

Therefore, in its order of November 29, 2007, the Court requested that the parties file supplemental briefs addressing the issue of whether a surety must provide notice of an actual default or whether notice of an impending or potential default can suffice. ICW, of course, avers that notice of either actual or potential default suffices. Pl.'s Supp. Br. at 10. The Government, surprisingly, concedes in its supplemental brief that "a surety's notice of an actual default under the bonded contract *is* sufficient to trigger the Government's duty of equitable subrogation, and notice of potential default under the bonded contract *may be* sufficient to trigger the Government's duty." Def.'s Supp. Br. at 1 (emphasis added). The use of "is" with actual default and the use of "may be" with potential default, however, introduce a note of ambiguity in the statement. The Government does not flesh out this statement with in-depth reasoning or analysis nor does it discuss under what circumstances notice of potential default may be sufficient to fulfill the notice requirement. As the Court concludes that notice of potential default is sufficient, the Court will discuss the basis for this conclusion for the sake of completeness and finality despite the Government's apparent concession. In addressing the issue of under what circumstances notice of potential default is sufficient, the Court will confine itself to the only argument advanced by the Government in this regard, that is, whether the notice of default in this case is additionally insufficient because it did not refer to the contracts at issue.

**i. Notice of a potential default can be sufficient to trigger the Government's "stakeholder" duty.**

The case which most clearly addresses the sufficiency of notice of potential default is *American Fidelity Fire Insurance Co. v. United States*, 513 F.2d 1375 (Ct. Cl. 1975).[5] In that case, the Government's equitable duty was apparently triggered without any explicit reference to an actual "default" by the contractor on the bond in question. In *American Fidelity,* a surety sent a letter of notice to the Government, requesting that contract funds be diverted from the prime contractor to the surety. *Id.* at 1377. The letter cited several California Civil Code sections dealing with the inability of a principal on a bond (e.g., a prime contractor) to pay third parties (e.g., subcontractors). *Id.* The Court of Claims stated that "reference to these sections of the California Civil Code coupled with the demand of the plaintiff surety was a caveat that a situation was arising wherein the contractor *may* default and plaintiff surety wanted to preserve its right of subrogation." *Id.* at 1380 (emphasis added). The Court of Claims went on to find that "[d]anger signals" were apparent to the contracting government agency, and that, under the circumstances, these warnings triggered a "stakeholder" duty on the part of the Government. *Id.*

Other cases in the Court of Federal Claims have also held that notice of potential default is sufficient. In *Hartford Fire Insurance Co. v. United States*, the court stated that the Government's equitable "duty to exercise reasonable discretion in administering contract funds" arises when "the surety notifies the government that the contractor has defaulted *or is in danger of defaulting* under the bond." 40 Fed. Cl. 520, 522-23 (1998) (emphasis added), *aff'd*, 185 F.3d

[5] The Court of Claims is the predecessor court of the U.S. Court of Appeals for the Federal Circuit and this Court. Its decisions are binding precedent on these courts.

885 (Fed. Cir. 1999) (Table opinion). In *Capitol Indemnity Corp. v. United States*, the court phrased the notice requirement as: "a payment bond surety must notify the government that the contractor is *or is close to being* in default," and later that "the surety must explicitly notify the government of the default or threatened default." 71 Fed. Cl. 98, 102-03 (2006) (emphasis added). Likewise, in *Lumbermens Mutual Casualty Co. v. United States*, the court stated that a surety must "notify the Government that the contractor cannot complete the contract," and denied relief because the surety therein did not "notify the Government that [the contractor] *was approaching default*." 67 Fed. Cl. at 255 (emphasis added). *See also Ransom v. United States* (*"Ransom I"*), 17 Cl. Ct. 263, 267-68 (1989) ("[T]he surety can attempt to recover progress payments or the final payment when it notifies the Government that its principal is in default, or is about to go into default.").

**ii. Statements finding notice of actual default to be sufficient do not foreclose the adequacy of a notice of potential default.**

The cases discussing actual default do not rule out the possibility that a notice of potential default could also trigger the Government's "stakeholder" duty to act with reasoned discretion to protect a surety's interest in contract funds. In other words, a holding that notice of an actual default does suffice to trigger the Government's duty does not necessarily mean that notice of a mere potential default cannot suffice.

The Federal Circuit's discussion in *Fireman's Fund Insurance Co. v. United States*, 909 F.2d 495 (Fed. Cir. 1990), illustrates this point. There, a contractor had been failing to pay its subcontractors and suppliers for several months, leading *the subcontractors and suppliers* to complain to the contracting officer. *Id.* at 496. During this time, however, the contracting officer still issued several payments to the contractor. It was not until after the contractor actually abandoned the contract that the plaintiff surety sent a letter notifying the contracting officer of the default. *Id.* In its suit against the Government, the plaintiff argued that the contracting officer should not have disbursed the payments to the contractor during the period of time the contractor had not been paying the subcontractors and suppliers. *Id.* at 497. In phrasing the rule on notice of default, the court said: "the government as obligee owes no equitable duty to a surety like Fireman's Fund unless the surety notifies the government that the principal *has defaulted under the bond*." *Id.* at 498 (emphasis added). But, in applying this rule to the facts of the case, the court did not close the door on potential default. Quite to the contrary, the court stated:

> We see no reason to impose on the government a duty toward the surety whenever a subcontractor or supplier complains of late or nonpayment by the contractor. Only the contract should limit the government's flexibility in resolving payment disputes so minor, and perhaps so inevitable, that the surety itself doesn't consider the contractor's role in them a *potential default* under the bond. Only when the surety *may* be called upon to perform, that is, only when it *may* become a party to the bonded contract, should the government owe it any duty. The surety knows best when this *may* occur; consequently, only notice by the surety triggers the

government's equitable duty.

*Id.* at 499 (emphasis added). The court, therefore, held that it was not improper for the contracting officer to have disbursed the progress payments.

The thrust of the court's reasoning is that for a notice of default to trigger the Government's stakeholder duty, the notice must be made *by the surety*. The Government owes no duty to consider the interests of the surety until the surety itself expresses its own concern regarding the contractor's ability to complete performance and pay all subcontractors and suppliers. *Id.* Whether the notice was one of an actual default or a potential default does not seem to affect the analysis, so long as the notice comes from the surety itself. Indeed, it appears from the Federal Circuit's discussion that the outcome in *Fireman's Fund* may have differed if the plaintiff had notified the contracting officer of the potential default back when the unpaid bills of the subcontractors and suppliers had first become a problem.

Similarly, the holding in *Balboa Insurance Co. v. United States*, 775 F.2d 1158 (Fed. Cir. 1985), does not rule out notice of potential default as a trigger of the Government's stakeholder duty.[6] There, the surety notified the Government's contracting officer that it "received written notice ... that led it to believe that [the contractor] was in financial straits and would not be able to fulfill its payment and performance obligations." *Id.* at 1160. Thus, the surety demanded that no further contract funds be released without its consent. *Id.* After this notice letter was sent, the contracting officer disbursed an additional progress payment directly to the contractor without first seeking the consent of the surety. *Id.* Citing *Newark Insurance Co. v. United States*, 169 F.Supp. 955, 957 (Ct. Cl. 1959), the court in *Balboa* concluded: "we are satisfied that the United States becomes a stakeholder with a duty of acting with reasoned discretion when a Miller Act surety alleges that the contractor *has breached the contract by defaulting* under one of the bonds." *Balboa*, 775 F.2d at 1162 (emphasis added). But the court in *Balboa* went on later in the opinion to state that the Government does not incur a duty "merely upon the unsupported request of a contractor's surety." *Id.* at 1164. This statement leaves the door open to the conclusion that a surety's request that the Government divert contract funds directly to the surety could trigger the Government's duty toward the surety, when the request *is* supported by some evidence or indication of a default. In other words, the substantiation of the notice of default seems to have been what the court in *Balboa* was concerned with, not the question of actual versus potential default. *Id.*; *accord, Ransom v. United States* ("*Ransom II*"), 900 F.2d 242, 245 (Fed. Cir. 1990) (interpreting *Balboa* as holding that the Government incurs a stakeholder duty to protect the interests of the surety when the surety "notifies the government that the surety's interest *is in jeopardy* because of default by the contractor") (emphasis added).

---

[6] Notably, in reaching its holding, the court in *Balboa* cited with approval the holding in *American Fidelity Fire Insurance Co. v. United States*, 513 F.2d at 1379-81. As discussed above, the Court of Claims in *American Fidelity* found that a letter expressing a fear of potential default sufficed to trigger the Government's duty toward the surety. *Id.*

In light of (1) the fact that the Court is not aware of any case which explicitly held that a notice of potential default cannot serve as the legal basis for a surety, exercising the right of equitable subrogation, to recover improperly disbursed contract funds; (2) the discussions in cases like *American Fidelity* which seemed to accept notices of potential default as sufficient; and (3) the Government's concession that potential default *may* trigger the Government's duty, the Court holds that a notice of potential default can trigger the Government's "stakeholder" duty to act with reasoned discretion to protect the interests of the surety in remaining contract funds. *See American Fidelity*, 513 F.2d at 1380; *Fireman's Fund*, 909 F.2d at 499; *Balboa*, 775 F.2d at 1162, 1164; *Ransom II*, 900 F.2d at 245; *Insurance Co. of the West v. United States*, 243 F.3d 1367, 1371 (Fed. Cir. 2001); *Argonaut Ins. Co. v. United States*, 434 F.2d 1362, 1367-68 (Ct. Cl. 1970); *see also Capitol Indem. Corp.*, 71 Fed. Cl. at 102 (For the Government to be liable for "improper disbursement of earned progress payments ... a payment bond surety must notify the government that the contractor is or is close to being in default."); *Ransom I*, 17 Cl. Ct. at 267-68 ("[T]he surety can attempt to recover progress payments or the final payment when it notifies the Government that its principal is in default, or is about to go into default."), *aff'd*, 900 F.2d 242 (Fed. Cir. 1990). The Court must now determine whether ICW's letter to the contracting officer contained a notice of potential default on the #182 and #183 contracts.

### C. ICW's Letter to the Contracting Officer

Despite the Court's inquiries focusing on the difference between notice of actual versus potential default, the Government continually stressed in its briefing that ICW's notice letter was not specific to the bonded contract. Def.'s Supp. Br. at 1 ("Respectfully, the issue before the Court is not whether the surety must give notice of actual or potential default to trigger the Government's equitable duty," but rather, whether the surety "notif[ied] the contracting officer of the contractor's actual or pending financial failure that threatens completion of the bonded contract.") (emphasis in original). Thus, the Government's primary argument for dismissal of ICW's claim is that the Government's duty to act with reasoned discretion to protect the interests of ICW was never triggered because ICW never provided notice of default specifically as to the bonded contracts at issue. *Id.* at 10.

Clearly, it would be unfair to impose on the Government a stakeholder duty if the Government did not know which bonded contract the notice of actual or potential default referred to. As stated in *Balboa*, "the United States becomes a stakeholder with a duty of acting with reasoned discretion when a Miller Act surety alleges that the contractor has breached the contract by defaulting *under one of the bonds*." 775 F.2d at 1162 (emphasis added). Thus, in this case, the Court's inquiry is whether ICW's letter to the contracting officer provided a notice of potential default that was specifically in regard to the bonded contracts at issue.[7]

ICW's June 28, 2006 letter to the contracting officer listed the two bonded contracts at

[7] The Government does not dispute that ICW itself sent this letter. *See Fireman's Fund*, 909 F.2d at 499.

issue (and only these bonded contracts) in its caption. Compl. at Ex. B. The letter reminded the contracting officer that "Insurance Company of the West (ICW) is the surety for Texas Mechanical Systems, Inc. (TMS) and issued payment and performance bonds in conjunction with the referenced projects." *Id.*

In addition, the letter stated that it "serves as ICW's formal request that no further funds be disbursed to TMS without the express written consent of ICW." *Id.* Though ICW never expressly alleged an actual or potential default, the letter does explain that "ICW has been made aware of claims and unpaid bills" on another bonded project involving TMS and that its request "is made in accordance with ICW's rights of equitable subrogation." *Id.* In the letter, ICW further explains that it "may be liable for any valid claims against other bonds for any alleged amounts due in conjunction with the same," indicating ICW's concern that TMS had become financially unstable. *Id.*

While the Government attempts to characterize the letter as one providing notice of actual default on "another bonded project," the Court finds that it provided notice of a potential default on the bonded contracts at issue in this case. *See* Def.'s Mot. at 14 (stating that ICW merely "notified defendant that Texas Mechanical was in default on another project"). Construing all reasonable inferences which can be drawn from the letter in favor of ICW, the Court believes that a reasonable and competent contracting officer who received this letter and read the caption and text would understand that it was expressing ICW's concern over TMS's ability to complete performance and/or pay all suppliers and subcontractors for the contracts at issue in this case. The letter implies that TMS's inability to pay vendors and subcontractors on another project made ICW uncertain of TMS's ability to do the same for the bonded contracts "referenced" in the caption.

As the Court has noted, in *American Fidelity*–without any explicit reference to an actual default–the mere reference to California Civil Code sections dealing with the inability of a principal on a bond to pay third parties coupled with the demand of the surety were "danger signals" that triggered the Government's duty. *American Fidelity*, 513 F.2d at 1380. At the very least, the contracting officer here, as in *American Fidelity*, should have noted that "danger signals were apparent," indicating there should be concern about a potential default by TMS on the bonded contracts at issue.[8] *Id.* Though the letter did not explicitly state that ICW believed TMS would be unable to complete the bonded contracts, ICW's letter cannot be read as anything other than a notification of the potential for TMS to default. Thus, the Court is satisfied that ICW has presented sufficient facts to show that the Government's "stakeholder" duty to act with reasoned discretion and "take 'reasonable steps to determine for itself that the contractor had the capacity and intention to complete the job'" was triggered. *Balboa*, 775 F.2d at 1164 (quoting *Fireman's*

---

[8] In addition, though the Government did not argue this issue, the Court finds that ICW's notice that TMS was potentially going to default on the bonded contracts at issue was not unsupported. It was substantiated by ICW's reference to TMS's failure to pay suppliers and subcontractors on another project. *See Balboa*, 775 F.2d at 1164.

*Fund Ins. Co. v. United States*, 362 F.Supp. 842, 848 (D. Kan. 1973)). In other words, ICW has adequately stated its claim, because it has presented facts or allegations "respecting all the material elements necessary to sustain recovery." *Twombly*, 550 U.S. ___, 127 S. Ct. at 1969 (quoting *Car Carriers*, 745 F.2d at 1106).

### D. The Government's Duty to Act With Reasoned Discretion to Protect ICW's Interests

By finding that ICW has alleged sufficient facts to state a claim for the recovery of improperly disbursed contract funds, the Court has not made any determination as to whether the VA should have withheld the progress payments at issue. The "stakeholder" duty to act with reasoned discretion to protect the interests of the surety does not automatically require the Government to withhold progress payments. *See, e.g., Argonaut*, 434 F.2d at 1368-69 (recognizing that "the Government has a duty to exercise its discretion responsibly and to consider the surety's interest in conjunction with other problems encountered in the administration of the contract," but finding that the Government did exercise its discretion responsibly when it refused to withhold a progress payment). Rather, the Government's "stakeholder" duty obligates it merely to "take 'reasonable steps to determine for itself that the contractor had the capacity and intention to complete the job.'" *Balboa*, 775 F.2d at 1164 (quoting *Fireman's Fund Ins. Co.*, 362 F.Supp. at 848). Ultimately, the reasonableness of the contracting officer's actions, including the contracting officer's decision here to disburse payments to TMS, is a factual question to be determined at trial or upon a motion for summary judgment. *See Balboa*, 775 F.2d at 1162 ("Whether and under what circumstances the Government chooses to disburse the progress payment in dispute pertains not to the issue of jurisdiction, but rather, to the propriety of the Government's actions."); *Insurance Co. of the West*, 243 F.3d at 1371 ("[T]he ultimate factual question to be resolved by the trial court [is] whether a payment to a contractor rather than the surety 'was a reasonable exercise of the discretion conferred on the contracting agency....'") (quoting *Balboa*, 775 F.2d at 1165).

Therefore, in this opinion, the Court does not reach the reasonableness of the contracting officer's actions after ICW sent its notice of potential default. The Court has not been presented with enough evidence to determine whether the contracting officer acted reasonably or unreasonably in declining to withhold the progress payments at issue from TMS. At this time, the Court finds only that, construing all reasonable factual inferences in ICW's favor, the June 28, 2006 letter sufficiently establishes that ICW provided a notice of potential default on the bonded contracts at issue.

## III. Conclusion

The Court finds that ICW has adequately stated its claim, because it has alleged sufficient facts "respecting all the material elements necessary to sustain recovery under *some* viable legal theory." *Twombly*, 550 U.S. ___, 127 S. Ct. at 1969. Accordingly, the Government's motion to dismiss this case pursuant to Rule 12(b)(6) of the RCFC for failure to state a claim upon which relief can be granted is hereby DENIED.

s/Edward J. Damich
EDWARD J. DAMICH
Chief Judge